**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE No.: 4:10-CR-00242-ALM-KPJ-9 |
| | § | |
| PERLA RODRIGUEZ | § | The Honorable Marcia A. Crone |
| | § | U.S. District Judge |
| Defendant. | § | |

**MOTION FOR COMPASSIONATE RELEASE**

**INTRODUCTION**

Perla "PJ" Rodriguez is now seeking compassionate release after being continuously incarcerated for nine years, asking that the sentence be reduced to time served with any additional conditions this court deems appropriate.[1] Rodriguez's motion should be granted for the following three reasons. First, Rodriguez has been diagnosed with kidney failure, asthma, and hypertension. The Centers for Disease Control has designated these conditions risk factors for vulnerability to COVID-19.  He also suffers from depression, which has been shown to increase the risk of a COVID-19.[2]  The BOP released Rodriguez to home confinement under the CARES Act on or about October 13, 2021, acknowledging that he is particularly vulnerable to COVID-19 in a prison setting.

---

[1] The name used in the record of this case is Perla Yazmine Rodriguez but because of the diagnosis of Gender Dysphoria, this motion will refer to the movant as "Rodriguez" or "P.J." and will use the pronoun "he." Carl G. Streed, Jr., M.D., *Terminology Related to Sexual Orientation, Gender Identity, and More*, Harvard Medical School (Mar. 22, 2017), https://dicp.hms.harvard.edu/sites/default/files/files/HMS%20SOGI%20terminology%203.22.17.pdf

[2] Joe Gramigna, *People with Mental Disorder Diagnosis at Greater Risk for COVID-19 Infection*, Healio (Nov. 4, 2020), https://www.healio.com/news/psychiatry/20201104/people-with-mental-disorder-diagnosis-at-increased-risk-for-covid19-infection

Second, Rodriguez has been diagnosed with Gender Dysphoria, identifying as a man, and was receiving hormone therapy from the BOP while living in FCI Dublin, a female facility. Rodriguez experienced discrimination, verbal harassment, and physical violence in prison because of being transgender. Furthermore, Rodriguez received inadequate medical treatment for his condition. His testosterone dosage was altered frequently, exacerbating his high blood pressure and causing stage-3 kidney failure. Currently Rodriguez is supposed to return to FCI Dublin when the COVID-19 state of emergency ends, putting him back in a situation that threatens his physical and mental health.

Third, Rodriguez is not a danger to society. The BOP has transferred him to home detention, which is only available to those who can safely be returned to the community. Furthermore, his son, who is entering adolescence, needs a parent. His sister is giving him a place to live and will reintegrate Rodriguez back into the community. Nothing more can be accomplished by returning Rodriguez to prison.

## STATEMENT OF FACTS

### A.    Personal History

Perla Jazmine Rodriguez ("Rodriguez" or "PJ") was born on November 19th, 1986. Rodriguez had a difficult childhood as the middle child with three siblings: a slightly older sister, a brother seven years younger, and a sister 19 years his junior. Their parents worked a lot and were not home often.  Rodriguez describes his mother as an alcoholic and abusive. Doc. 348 at ¶ 29. Consequently, P.J. had to stay with family members so that he was not left alone for long periods of time.

Rodriguez's father sensed that PJ had gender dysphoria but did not know how to handle this undiagnosed condition and, as a result, was also abusive. *See id.* He complained that PJ acted

like a tomboy and he wanted him to wear dresses and be more feminine. *See* Ex. A at 1. His parents fought about how to deal with his masculine attributes, among other things. They eventually divorced. At one point PJ's mother told him that they divorced because of him, an assertion his father did not contradict, although their split was in fact due to many factors.

This familial trauma, in conjunction with Rodriguez's discomfort at being female caused Rodriguez to attempt suicide three times by the age of 13. He tried to cut his wrists twice. His parents did not acknowledge these suicide attempts beyond providing minimal medical care. In his final suicide attempt, he tried to shoot himself with his father's gun but did not know how to take the safety lock off. At that point he decided that he was meant to live and started saving money to be able to live on his own.

When he was 19, his mother gave birth to his baby sister. *See* Doc. 348 at ¶ 29. At that point his mother's alcoholism was out of control, and his parents separated. P.J. became responsible for caring and providing for the infant and his younger brother. He was also working at a call center while attending school full-time, in the hopes of attending college and getting a degree. *Id.* at ¶¶ 34-35. A serious relationship ended at this time, removing a source of support for the burdens he was carrying and leading him to struggle with alcohol use himself. *Id.* at ¶ 32.

Rodriguez eventually sought the companionship and support of a childhood friend. The relationship became intimate and Rodriguez became pregnant at age 21. *Id.* at ¶ 29. Realizing that the relationship was not right for him because of his gender dysphoria, Rodriguez decided to keep the child but not marry the father. *Id.* Because he refused to get married, his parents kicked him out of the family home. *Id.*; Ex. A at 2. Pregnant and without familial support, he moved in with his uncle and then later he moved in with the father of the child. Ex. A at 2. When his son, J.G.L.

was born in February 2009, Rodriguez dropped out of school and quit his job to care for him. His son's father was in school, so they needed a source of income.

At a loss for how to support himself while also being able to take care of his child, Rodriguez was introduced to someone who needed assistance in driving drugs across state lines. Rodriguez was looking for a legitimate source of income, but faced with having to support a child, he "made the worst decision of my life" and transported marijuana in exchange for cash. Rodriguez made enough money to support his son, get his own apartment, and pay the bills. His life was stable until he was arrested in Kansas and sentenced to 8 months in prison and 1 year parole for conspiracy to distribute. Doc. 348 at ¶ 22.  His son lived with his father's aunt, but when Rodriguez was released, he fought successfully to regain custody of his son. Ex. A at 2-3. He completed probation without incident, and after he was free, decided to return to El Paso, Texas, to be closer to his siblings. *Id.*

Shortly after his return to El Paso, Rodriguez and his siblings went to a family gathering in Juarez, Mexico. *Id.* Rodriguez was arrested at the border when returning home based on an outstanding warrant for a federal drug conspiracy charge.  He knew nothing about the charge because the indictment had come down while he was incarcerated in Kansas. *Id.* at 3. He was held without bail and transferred to Dallas, where he first learned that he was being charged for conspiracy with intent to distribute methamphetamine. Rodriguez did not know that he had transported methamphetamine; he assumed that he was moving marijuana, as he had when he was picked up on the state charge. Doc. 335 at 7; Doc. 336 at 28. He explained that he drove the car; he was not present when the drugs were hidden in the car or retrieved. Nevertheless, on advice of counsel, Rodriguez pleaded guilty to distributing methamphetamine. Doc. 335 at 14. After he pleaded guilty, Rodriguez hired another attorney, Donald Bailey, who filed a motion to withdraw

ACTIVE.134902806.01

the guilty plea. Doc. 323, 324. The judge ordered a hearing but ultimately denied the motion to withdraw the plea.

Rodriguez was sentenced on November 11, 2014 to 168 months for conspiracy to possess with intent to distribute 500 grams or more of a mixture containing a detectable amount of methamphetamine. His current release date is December 16, 2024. Ex. B at 1.

### B.    Release on Home Confinement

Due to deteriorating conditions in BOP facilities arising from the Covid 19 pandemic, former Attorney General William Barr issued two memoranda, one on March 26, 2020, and the other on April 3, 2020.[3] The memos direct the BOP to identify incarcerated persons particularly vulnerable to Covid-19 who could be transferred to home confinement. Candidates are "at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentence in home confinement rather than in BOP facilities." March 26 Directive at 1. The policy is designed to cater to people for whom "home confinement may be more effective in protecting their health." *Id.* Under this policy, the BOP released Rodriguez to home confinement on October 13, 2021.

### C.    Vulnerability to COVID-19 and Inadequate Medical Care

The BOP has placed Rodriguez in home confinement because he is vulnerable to COVID-19. Rodriguez suffers from uncontrolled hypertension. A recent study by the European Society of Cardiology reports that individuals with high blood pressure "have a two-fold increased risk of dying from the coronavirus COVID-19 compared to patients without high blood pressure."[4] Since June 2020, Rodriguez has consistently had elevated blood pressure readings: 141/97 (June 30);

---

[3] The documents are reproduced in an Addendum to this brief.

[4] *High blood pressure linked to increased risk of dying from COVID-19,* European Society of Cardiology, (June 5, 2020), https://www.escardio.org/The-ESC/Press-Office/Press-releases/High-blood-pressure-linked-to-increased-risk-of-dying-from-COVID-19.

ACTIVE.134902806.01

154/96 (July 6); 159/102 (July 9); 153/99 (July10); 143/91 (July 14); 136/87 (July 22); 164/110 (Aug. 3); 140/70 (Aug. 5); 144/98 (Aug. 8); 141/87, 144/94 (Sept. 9); 150/110 (Nov. 24); 150/100 (Mar. 9, 2021); 133/91 (Mar. 10); 149/111 (Apr. 6); (Apr. 7); 140/96 (Apr. 11); 150/90 (Apr. 13); 148/100 (May 4); 160/110 149/94 (Sept. 16); 136/84 (Sept. 22). Ex. C at 4, 25, 84, 169. Nor is this a new development. Ex. D at 1-3. His 2019 medical records indicate a history of hypertension. Ex. C at 312. Of the 31 blood pressure readings the BOP has taken since February 2019, only two have been in the normal range. *Id.* According to the Mayo Clinic, Rodriguez has stage 2 hypertension (sustained systolic pressure over 140 and diastolic pressure over 90) and recommends talking to a "doctor about taking more than one medication."[5] However, the BOP prescribed 20 mg of Lisinopril in July 2020 but has not adjusted the medication or added a second prescription despite Rodriguez's dangerously high readings for over two years. Ex. C at 147. The American Heart Association considers sustained high blood pressure readings to be a hypertensive "urgency."[6] Hypertension is a major risk factor for heart failure; 75% of patients who suffer heart failure have hypertension.[7] Rodriguez's blood pressure is "inappropriately managed" putting him at a "significant risk of developing cardiovascular complications." Ex. D at 3.

Uncontrolled stage 2 hypertension can result in irreversible damage to the heart, kidneys, and brain.[8] Ex. D at 2.  On May 13, 2021, Rodriguez had a creatinine level of 1.28 and his Glomerular Filtration Rate (GFR), which is used to measure kidney function, was 47. Ex. C at 72.

---

[5] *Blood Pressure Chart: What your reading means*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/blood-pressure/art-20050982

[6] American Heart Association, Hypertension Guideline Toolkit, http://aha-clinical-review.ascendeventmedia.com/books/aha-high-blood-pressure-toolkit/2/, page 5

[7] Keith C. Ferdinand, and Carola Maraboto, *Is Electrocardiography-Left Ventricular Hypertrophy an Obsolete Marker for Determining Heart Failure Risk With Hypertension?* Journal of the American Heart Association. 2019;8 (Apr. 4, 2019), https://doi.org/10.1161/JAHA.119.

[8] American Kidney Fund, "Stages of Chronic Kidney Disease (CKD)." Accessed August 17, 2021. https://www.kidneyfund.org/kidney-disease/chronic-kidney-disease-ckd/stages-of-chronic-kidney-disease/

ACTIVE.134902806.01

This result indicates stage-3 kidney failure: the ideal score is 100 and anything under 60 is considered abnormal. Although Rodriguez's creatinine levels decreased in June and September to about 1.04, they were still out of range and indicated decreased kidney function. The symptoms of stage-3 kidney disease can include swelling of the hands and feet, back pain, and urinating more or less than normal.[9] Rodriguez's medical records reflect that he has experienced most of these symptoms. Ex. C at 124, 139, 261, 277, 294, 299. Furthermore, hypertension and kidney disease are highly correlated and their co-occurrence heightens the risk for negative outcomes because kidney function is closely linked to immune function.[10] Recent data suggest that patients with pre-existing kidney disease are more likely to develop complications if infected with Covid-19.[11]

FCI Dublin, where Rodriguez was held, had a serious outbreak of COVID-19 in December 2020.  Rodriguez tested positive for COVID-19 on December 22, 2020. Ex. C at 222. Ten days later he was determined to have recovered. *Id.* at 122. His medical chart does not indicate that he was monitored or treated during his illness. Rodriguez still suffers from COVID symptoms, making him a "long hauler," an area where research is ongoing. Ex. D at 4-5. The BOP has recognized the gravity of his health conditions and his vulnerability to reinfection by deciding to transfer him to home confinement under the CARES Act.

### D.    His Transgender Identity

The term transgender refers to a person whose sex assigned at birth does not match their gender identify.  "Gender identity" is a person's innermost concept of self as male, female, a blend

---

[9]   American Kidney Fund, "Stages of Chronic Kidney Disease (CKD)." Accessed August 17, 2021. https://www.kidneyfund.org/kidney-disease/chronic-kidney-disease-ckd/stages-of-kidney-disease

[10]   Eric Judd and David A. Calhoun, *Management of Hypertension in CKD: Beyond the Guidelines*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4445132/

[11]   Prince Dadson et. al., *Underlying Kidney Diseases and Complications for COVID-19: A Review*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7719811/

ACTIVE.134902806.01

of both or neither. It is how individuals perceive themselves and what they call themselves. One's gender identity can be the same or different from their sex assigned at birth.

Transgender people have a gender identity or gender expression that is different from cultural expectations based on the sex they were assigned at birth. Some transgender individuals experience "gender dysphoria," which refers to a psychological distress that results from an incongruence between one's sex assigned at birth and one's gender identity. Gender dysphoria involves clinically significant distress. According to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM), the term—which replaces Gender Identity Disorder — "is intended to better characterize the experiences of affected children, adolescents, and adults."[12] Gender dysphoria has been treated as a psychiatric diagnosis since about 1949. *Id.* This name change redirected the diagnosis to the distress that some transgender people experience rather than the individuals or identities themselves. *Id.* Professionals strive to balance providing transition-related health care while minimizing the degree to which such a diagnosis may categorize or stigmatize the transgender individuals.

The distress incurred by gender dysphoria can be alleviated through several different means of gender affirmation, and they are all very dependent on the individual person. Gender affirmation can be achieved socially by changing one's name or pronouns. It can also be achieved legally or medically, by changing one's gender markers on government-issued documents or using gender affirming hormones. Gender affirmation is also commonly achieved surgically. However, not all transgender people need or want all of these aspects of gender affirmation. These needs are highly personal and predicated upon individual decision-making.

---

[12] *Sexual Orientation and Gender Identity Definitions*, Human Rights Campaign, https://www.hrc.org/resources/sexual-orientation-and-gender-identity-terminology-and-definitions

ACTIVE.134902806.01

Rodriguez is transgender and identifies as a man.  Ex. C at 273, 275. He has reported lifelong discomfort at being female and was suicidal in his early adolescence. *Id.*  He has been diagnosed with Gender Dysphoria by the BOP and receives gender-affirming testosterone shots at FCI Dublin.  *Id.* These shots are critical to his medical care.  Rodriguez's medical record indicates his testosterone shots are not being properly managed in light of his other conditions. Ex. D at 2.

Rodriguez was transferred from the camp at Dublin to the higher-security correctional institution because the BOP needed to move people around to control the spread of COVID-19, not for any disciplinary reason. During the first two weeks of lockdown, he was not permitted to leave his cell to shower, access the commissary, call his family, or for any other reason. Even after things opened up a bit, Rodriguez had to compete with 100 other people to access the five computers and three phones to connect with family and friends within a single hour each day. On June 17, 2020, another individual cut ahead of Rodriguez when it was his turn to use the phone and when he objected, she mocked his sexuality, provoking a fight. Although no one was injured, this 200-series disciplinary write-up prevented Rodriguez from returning to the camp. Ex. B at 2.

## ARGUMENT

A court must answer three broad questions to determine if compassionate release is warranted. 18 U.S.C.§ 3582(c)(1)(A). First, the court must determine whether the defendant exhausted all administrative remedies. *See, e.g., United States v. Franco*, 973 F.3d 465, 467 (5th Cir.), *cert. denied*, 141 S. Ct. 920 (2020). Second, the court evaluates whether "extraordinary and compelling circumstances" warrant a reduction of the term of imprisonment that the court previously imposed. *Id.* Finally, the court must consider whether any such reduction is consistent with the statutory purposes of sentencing. *Id.*; *see also* 18 U.S.C. § 3582(c)(1)(A); 18 U.S.C. § 3553(a).

ACTIVE.134902806.01

# I.
## RODRIGUEZ IS ELIGIBLE FOR COMPASSIONATE RELEASE BECAUSE HE HAS EXHAUSTED HIS ADMINISTRATIVE REMEDIES

Rodriguez has completed all the steps necessary to exhaust administrative remedies. Anyone seeking compassionate release from the courts must first request compassionate release from the Warden and wait 30 days for a response.  18 USC § 3582(c)(1)(A). See P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018). On July 11, 2020, Rodriguez sought the Warden's support for his release due to being transgender and having hypertension and asthma which made him vulnerable to COVID-19. Ex. E at 2. When he did not receive a response, he filed a request on September 14, 2020 for home confinement, again citing hypertension, asthma, and hormone treatments as grounds for COVID-19 vulnerability. *Id.* at 1. That request was denied on September 30, 2020 because he "did not have COVID-19 risk factors." *Id.* Subsequent events demonstrated that this determination was inaccurate.

Rodriguez has exhausted his remedies and his motion may now be decided on the merits. *See, e.g., United States v. Franco*, 2020 WL 5249369 at *1-2, No. 20-60473 (5th Cir. Sept. 3, 2020).

# II.
## THE CORONAVIRUS PANDEMIC, RODRIGUEZ'S TRANSGENDER STATUS AND OTHER MEDICAL CONDITIONS, CONSTITUTE EXTRAORDINARY AND COMPELLING CIRCUMSTANCES WARRANTING COMPASSIONATE RELEASE

Rodriguez's circumstances are extraordinary and compelling for two reasons: first, his heightened vulnerability to COVID-19; second, his status as a transgender man living in a woman's facility experiencing problems with the testosterone injections prescribed to treat his gender dysphoria. A reason is extraordinary when it is "beyond what is usual, customary, regular, or common." *United States v. Clausen*, No. CR 00-291-2, 2020 WL 4260795, at *7 (E.D. Pa. July 24, 2020) (citing the definition of extraordinary from the 11th edition of Black's Law Dictionary).

Hypertension, depression, kidney failure, and asthma during a once-in-a-century pandemic, in conjunction with gender-dysphoria that is not being properly treated, make Rodriguez's case extraordinary. Moreover, a need is compelling when it is "so great that irreparable harm or injustice would result if it is not met." *Id.*

Rodriguez has served his time behind bars at FCI Dublin for nearly a decade without significant incident. Because of COVID-19 and his co-morbidities, his health could be permanently damaged if he is not granted compassionate release. The BOP has already granted Rodriguez home confinement, thus indicating their agreement that Rodriguez is at particular risk in the prison system.

## A.     Purpose of Compassionate Release

Compassionate Release was first introduced as part of the Comprehensive Crime Control Act of 1984, which abolished federal parole. Section 3582(c) created compassionate release as a limited replacement by allowing a district court to modify "term of imprisonment" when "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). Congress did not define what would constitute an "extraordinary and compelling reason," but the legislative history gives some guidance. The Comprehensive Crime Control Act created a "completely restructured guidelines sentencing system." S. Rep No. 98-225, at 53 n.196 (1983). Specifically, the Senate Committee acknowledged the possibility of changed circumstances, stressing that a mechanism was needed to handle individual cases that warranted a second look at resentencing in the absence of parole:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which **other extraordinary and compelling circumstances justify a reduction of an unusually long sentence**, and some cases in which the sentencing guidelines for

> the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

*Id*. at 55–56 (emphasis added). Congress intended for the situations listed in § 3582(c) to act as "safety valves for modification of sentences," *id.* at 121, when justified by various factors that previously could have been addressed through the (now abolished) parole system. This particular safety valve would "assure the availability of specific review and reduction to a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines." *Id.* Noting that this approach would keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, the statute permitted "later review of sentences in particularly compelling situations." *Id.* Congress did not limit the safety valve of § 3582(c)(1)(A) to medical or elderly release. Any "extraordinary and compelling circumstance" could "justify a reduction of an unusually long sentence." S. Rep No. 98-225, at 55.

## B.   The COVID-19 Pandemic Remains Deadly and the BOP Has Conceded That Rodriguez Remains at Risk

The combination of the COVID-19 pandemic and an individual's medical vulnerabilities are sufficient to constitute extraordinary and compelling reasons for release. *United States v. Jenkins*, 460 F. Supp. 3d 1121, 1128 (D. Colo. 2020). Just as life in the United States was beginning to return to normal, the Delta variant hit, causing a deadly fourth wave of COVID-19 which is still ongoing. Very recently, the Omicron variant was identified in California, where FCI Dublin is located.[13] The danger of COVID-19's current and future variants remains real, especially for those who are vulnerable and cannot protect themselves, such as Rodriguez.[14] The BOP has recognized

---

[13] Kaitlin Collins et al., *First confirmed US case of Omicron coronavirus variant detected in California*, CNN Health, (Dec. 1, 2021), https://www.cnn.com/2021/12/01/health/us-omicron-variant-confirmed-case/index.html

[14] Benjamin A. Barsky, J.D. et al. "Vaccination plus Decarceration — Stopping Covid-19 in Jails and Prisons." The New England Journal of Medicine, April 29, 2021; 384:1583-1585.  DOI: 10.1056/NEJMp2100609 https://www.nejm.org/doi/full/10.1056/NEJMp2100609

the risk the pandemic poses to certain incarcerated individuals, and noted in Rodriguez's medical files that "Home Confinement provides the opportunity for the inmate to practice optimal infection prevention control measures, which may mitigate existing risks based on rates of transmission in the local area, and is likely not to increase the inmate's risk of contracting COVID-19." Ex. C at 23. The BOP released Rodriguez on home confinement on October 13, 2021.

Rodriguez has several medical conditions that make him vulnerable to COVID-19, thus warranting compassionate release. Individuals with co-morbidities that make them vulnerable to COVID-19 can show "extraordinary and compelling" circumstances warranting compassionate release. For example, the Western District of Texas found that a defendant's "several serious medical conditions," including type-2 diabetes, hypertension, obesity, and a history of hepatitis-C, constituted extraordinary and compelling reasons "when viewed individually or together" in light of the COVID-19 pandemic. *United States v. Ford*, No. EP-15-CR-01851-DCG, 2020 WL 8087945, at *1 (W.D. Tex. Dec. 23, 2020). The Southern District, too, has acknowledged that a defendant's "underlying medical conditions of type 2 diabetes, severe obesity, and hyperlipidemia, combined with her inability to provide self-care by practicing social distancing and other protective measures against COVID-19 within the environment of a correctional facility, constitute extraordinary and compelling reasons for early release." *United States v. Fuentes*, No. CR 6:19-6-2, 2021 WL 609844, at *4 (S.D. Tex. Jan. 6, 2021). *See also United States v. Muniz*, No. 4:09-CR-0199-1, 2020 WL 1540325, at *1 (S.D. Tex. Mar. 30, 2020) (finding that the defendant was particularly vulnerable to severe illness from COVID-19 due to medical conditions such as end stage renal disease, diabetes, and arterial hypertension); *United States v. James*, No. CR 13-85, 2020 WL 7630780, at *5 (E.D. La. Dec. 22, 2020) (holding that the defendant's medical conditions of hypertension, high cholesterol, obesity, and type II diabetes rendered the defendant particularly

vulnerable to contracting COVID-19 such that the bar of extraordinary and compelling was met).

Until the vaccine roll-out, the United States has also reached this conclusion in other cases: "If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19, that condition satisfies the standard of 'extraordinary and compelling reasons.'" *United States v. Lambert*, No. 2:15-CR-00454-TC, 2021 WL 391427, at *3 (D. Utah Feb. 4, 2021) (citing the government's opposition brief).

### 1.    *The BOP cannot manage Rodriguez's hormone therapy, constituting grounds for compassionate release*

FCI Dublin medical staff have demonstrated that they cannot provide adequate care to Rodriguez, as demonstrated by his erratic testosterone levels, justifying a finding of "extraordinary and compelling" circumstances in this case. Failure to control a medical condition that makes one vulnerable to COVID-19 can be the basis for relief. *United States v. Douglas*, No. CR 10-171-4 (JDB), 2021 WL 214563, at *6 (D.D.C. Jan. 21, 2021) (granting compassionate release in part because "the Court is not persuaded that 'BOP is closely monitoring and treating the defendant's condition,' . . . to such an extent as to allay concerns over his vulnerability to COVID-19."); Ex. D at 1.

Rodriguez is transgender and identifies as a man. The BOP has diagnosed him with Gender Dysphoria, which is recognized by the American Psychiatric Association.[15] Consequently, the BOP is administering gender-affirming testosterone shots. This process is tricky to manage under the best of conditions and Rodriguez is undergoing treatment in a substandard medical care system stretched to the breaking point by a pandemic. His medical records indicate significant swings in hormone levels. On May 13, 2021, his bi-weekly dosage was lowered from 200 to 100 mcg. Ex.

---

[15]American Psychiatric Association. (2013). Diagnostic and Statistical Manual of Mental Disorders (5th ed.). Arlington, VA: American Psychiatric Publishing, https://www.psychiatry.org/psychiatrists/cultural-competency/education/transgender-and-gender-nonconforming-patients/gender-dysphoria-diagnosis

ACTIVE.134902806.01

C at 52. On June 21, his testosterone level was too low: 123 ng/dL when the bottom of the desired range was 250 ng/DL. *Id.* at 66. At the end of July, his dosage was increased back to 200 mcg. *Id.* at 52. By September 20, his testosterone level measured too high at 589 ng/dL. *Id.* at 61.  His dosage was then lowered again, resulting in an excessively low reading on his next test and continuing the cycle. *Id.* at 7, 12.

Rodriguez is also suffering from side effects that would normally indicate a change in treatment. For instance, Rodriguez has sought medical attention for migraines, which can be ameliorated by changing the dose and the way the hormones are administered.[16] Rodriguez's medical records indicate that his dosage has been altered for his mood, but his physicians have not made appropriate changes for his migraines or his hypertension, despite hypertension being listed as a concern in his medical records. Ex. C at 73, 153; Ex. D at 2.

### 2. The BOP cannot control Rodriguez's hypertension, constituting grounds for compassionate release

Hypertension is a well-known result of hormone treatments. Ex. D at 2. Rodriguez had Stage 2 hypertension even before starting hormone treatments on November 5, 2019. Between March and November 2019, the BOP discontinued his medication. Doctor Ramón Antonio Rodriguez, a resident physician at Brigham and Women's Hospital in Boston, MA, reviewed Rodriguez's medical records and determined that "[l]ack of aggressive control of his hypertension prior to starting testosterone indicates that he received inappropriate care based on these guidelines," noting that being off medication was the "most likely contributor to poor management of his hypertension." Ex D. at 2. The BOP improperly started him on hormone therapy with high

---

[16] Madeline B. Deutsch, MD, MPH, Overview of masculinizing hormone therapy, USCF Transgender Care (June 17, 2016) ("Patients with a history of migraines should consider starting with a low dose and titrating upward as tolerated. Transdermal testosterone may be preferred to avoid any potential cyclic effect associated with injected testosterone."), https://transcare.ucsf.edu/guidelines/masculinizing-therapy

ACTIVE.134902806.01

blood pressure and then did not act when his blood pressure remained unacceptably high. Ex. C at 19. Since June 2020, Rodriguez has consistently had blood pressure readings as high as 164/110 on August 3, 2020, with a low mark of 133/91 on March 10, 2021. His last readings before leaving FCI Dublin were 160/110 and 149/94 (Sept. 16); 136/84 (Sept. 22). Ex. C at 4, 25, 84, 169.

Hormone therapy can exacerbate hypertension.  Long-term effects of uncontrolled Stage 2 hypertension include "irreversible damage to the heart, kidneys, and brain." Ex. D at 3.  PJ's hormone therapy will continue to be managed by the BOP if he were to be reincarcerated when the government deems the Pandemic to have ended. In fact, Rodriguez now has stage-3 kidney failure. The BOP is unable to care for him properly, providing another ground for granting him compassionate release. *United States v. Turner*, No. CR 07-343, 2021 WL 786072 (E.D. La. Feb. 26, 2021) (finding that limitations on BOP medical treatment weighed in favor of compassionate release); *United States v. Newell*, No. 1:14-CR-161-1, 2021 WL 3269650 at *10 (M.D. N.C. July 30, 2021) (reducing the sentence of an incarcerated person who faced delays receiving treatment from BOP physicians for his medical condition, gastritis, during the COVID-19 pandemic). By transferring Rodriguez to home confinement, the BOP has acknowledged that he is "safer" serving his sentence at home; this situation is tailor made for a grant of compassionate release.

## C.  This Court Has the Discretion to Determine that Rodriguez's Health Combined with his Status as a Transgender Man Assigned to a Woman's Facility Is Extraordinary and Compelling

Transgender people face specific and unique difficulty in prisons due to ignorance, discrimination, and violence from guards and other prisoners.[17] Moreover, transgender prisoners are often more vulnerable than other prisoners to physical assault, verbal harassment, and sexual

---

[17] *See, e.g. ,*National Center for Transgender Equality,  *LGBTQ People Behind Bars, A Guide to Understanding the Issues Facing Transgender Prisoners and Their Legal Rights* (2018), https://transequality.org/sites/default/files/docs/resources/TransgenderPeopleBehindBars.pdf

violence. *Id.*  The BOP recognizes this and requires people who are transitioning to report abuse as part of its stated zero tolerance policy for discrimination. Ex. C at 378. In reality, however, staff are just as likely as other incarcerated people to harass and target transgender people in their custody.

Rodriguez is a transgender man who lived in a women's facility.  As a consequence of his gender identity, he was targeted by facility staff and BOP officers. Officers taunted him, viewed him as a threat, and arbitrarily searched his things. Other inmates also targeted him. Some women at FCI Dublin attempted to provoke him into fighting due to their own biases against transgender individuals. Rodriguez faced extreme hardship as he was a constant target at FCI Dublin. He explains, "I was diagnosed with gender dysphoria, which means that I feel that I was born in the wrong body. I should be a male instead of female. I work very hard to ignore the bullying and insults."

This Court has discretion to find that Rodriguez's health concerns and gender dysphoria constitute "extraordinary and compelling" circumstances. The Fifth Circuit has concluded that the Sentencing Commission's Application Notes, that essentially limit compassionate release for those who are elderly and/or terminally ill, no longer apply because § 1B1.13 is not an "applicable policy statement[]" for purposes of a compassionate release under 18 U.S.C. § 3582(c). *United States v. McCoy*, 981 F.3d 271, 280 (5th Cir. 2020). Other circuits have reached the same conclusion. The Second Circuit explained, "[T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020); *accord, United States v. Jones*, 980 F.3d 1098, 1101

(6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). In sum, this Court has the discretion to consider Rodriguez's status as a trans man along with his health conditions as an "extraordinary and compelling" circumstance warranting compassionate release.

### III.
### RODRIGUEZ HAS BEEN INCARCERATED FOR NINE YEARS WHICH IS LONG ENOUGH TO FULFILL THE PURPOSES OF HIS SENTENCE UNDER SECTION 3553(A)

Rodriguez has served a total of nine years in prison.  The parsimony principle instructs courts to "impose a sentence sufficient, but not greater than necessary, to comply with" the four purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 137 S.Ct. 1170, 1175 (2017) (citing §3553(a)(2)(A)–(D)). In determining whether a person presents a danger, a court considers the charge, the weight of evidence, health, family ties, and social history.  *See* 18 U.S.C. § 3142(g). By virtue of placing Rodriguez in home confinement, the BOP has confirmed that he is not a threat to society.

The record in this case supports the BOP's conclusion that Rodriguez does not present a danger to his community. His role in the drug conspiracy was limited to transporting what he thought was marijuana and did not involve violence. Courts have granted compassionate release to individuals with much more extensive criminal histories than Rodriguez, finding no threat to public safety. *United States v. Ford* No. EP-15-CR-01851-DCG, 2020 WL 8087945, at *1 (W.D. Tex. Dec. 23, 2020) (granting compassionate release after acknowledging the defendant's criminal history, involving prior convictions for felony drug, forgery, and theft, "weighs against her"); *United States v. Conner*, 465 F. Supp. 3d 881, 893 (N.D. Iowa 2020) (granting compassionate release although the defendant had "serious" criminal history because no violent crimes were involved); *United States v. Fisher*, 2020 WL 5992340 (S.D.N.Y. Oct. 9, 2020) (reducing a life sentence for involvement with a violent narcotics ring); *United States v. Williams*, 2020 WL

1751545, at *3 (N.D. Fla. Apr. 1, 2020) (granting release and reducing a life sentence for conviction of armed robbery); *United States v. Ikegwuonu*, No. 15-CR-21-WMC-1, 2021 WL 719160, at *3 (W.D. Wis. Feb. 24, 2021) (granting compassionate release after defendant pled guilty to five counts of armed robbery and one count of brandishing a firearm, after taking the defendant's regret for letting his family down and his need to take care of his sick mother into account).

Furthermore, Rodriguez spent most of his incarceration at the camp at Dublin, the lowest level security facility in the BOP system. He was transferred to the FCI because of COVID-19 as prison officials were forced to move prisoners around in an attempt to keep positive people quarantined, not because of any behavioral issue. His disciplinary history consists of minor infractions (e.g. possession of an unauthorized item) with the exception of an incident in August 2020, when another woman cut ahead of him in the line to use the computer during the single hour they were released from lockdown due to COVID-19. The unit only had three telephones and five computers for over 100 women. When the other woman insulted his sexuality and pushed him, he pushed back. Both ended up in segregated housing for 30 days. Because of the scuffle, Rodriguez remained at the minimum security FCI until his release. But being provoked into a shoving match after months of being locked down and having limited contact with the outside world is hardly a valid basis for denying him compassionate release because of alleged dangerousness, particularly when the BOP did not consider the infraction a reason to deny Rodriguez home detention.

Rodriguez has served over two-thirds of his sentence and has used the nine years he has served productively.  The Supreme Court held that "evidence of post-sentencing rehabilitation may plainly be relevant to 'the history and characteristics of the defendant.'" *Pepper v. United States*, 562 U.S. 476, 491 (2011) (citing §3553(a)(1)). Rehabilitation is a critical factor in determining if

a person should be granted compassionate release. *United States v. Brown*, No. 4:05-cr-00227-1, 2020 WL 2091802, at *7 (S.D. Iowa Apr. 29, 2020). In addition to keeping out of trouble, Rodriguez has nearly completed a welding apprenticeship and would be able to finish it and find employment as a welder should he be released. He has taken advantage of numerous educational opportunities provided by the BOP, including 96 hours of instruction in Core/HVAC Level I from Blinn College. Ex. F at 1. Rodriguez also completed two financial planning courses to prepare himself for his financial responsibilities after prison. *Id.* at 5-6.

Rodriguez's family has expressed their willingness to help him reintegrate into society and be a productive and law abiding citizen. He is currently living with his sister. His brother-in-law, who is currently housing him, highlighted his work ethic and all that Rodriguez has yet to contribute, "[PJ] has kept positive, taking advantage of the time [he] is in there, taking classes, certifications, and working on [him]self to be ready and productive when [he] is out . . . [he] is ready to start [his] life again and be a productive member of our community . . . Our economic situation is stable enough to have [him] here with us until [he] can pick [his] life back up. We hope this time will come really soon." Ex. G. at 5-6. Rodriguez has a network of familial support, including Richard Sanchez, the former Los Angeles Chief of Police, who writes:

> Should [PJ] get compassion[ate] release from prison, we know that [he] will be able to take care of [his] son and be a law- abiding citizen. [He] can share [his] life lesson with other single [parents] and be a thriving member in the community. [PJ] has always had a way of taking a bad situation and turning it into a positive one given the opportunity.
> With at least two family members being in law enforcement, [he] has the support and guidance to keep [him] [o]n the right track. [He] has a family support system throughout Texas, California and Washington State. We have positive role models within a supportive family structure that [he] can reach out to when in need." *Id.* at 2.

Rodriguez also is committed to being a spokesman for the transgender community to enhance understanding of trans people in the general community when people are ready and interested in what he has to say.

## IV.
## RODRIGUEZ'S RECENT RELEASE TO HOME CONFINEMENT DOES NOT PRECLUDE HIS COMPASSIONATE RELEASE

Rodriguez was released on home confinement on October 13, 2021. While home confinement will help Rodriguez receive proper medical care and protect him from many of the COVID-19 risks he faces in prison, home confinement does not preclude Rodriguez from being given compassionate release. Remaining on home confinement, rather than compassionate release, puts Rodriguez at risk of being returned to prison, even after having reintegrated into his community and family. The Department of Justice currently takes the position that once the COVID-19 state of emergency ends, everyone on home confinement under the CARES Act will have to return to prison within 30 days. Mem. Op., DOJ Office of Legal Counsel, Home Confinement of Fed. Prisoners After the COVID-19 Emergency (Jan. 15, 2021).[18] Rodriguez is particularly vulnerable to COVID given his various health conditions, but the risks he faces in prison due to his Gender Dysphoria and related treatment will not abate with the pandemic. Rodriguez has also served the majority of his sentence and has extensive support for his integration. Rodriguez meets the criteria set forth for compassionate release, his home confinement does not change this. *United States v. Rodriguez*, No. CR 15-198, 2020 WL 5369400 (E.D. La. Sept. 8, 2020) (noting that requests for home confinement and compassionate release are distinct); *United States v. Soun*, 492 F. Supp. 3d 1314 (S.D. Ala. 2020) (finding that home confinement is

---

[18] https://www.justice.gov/sites/default/files/opinions/attachments/2021/01/17/2021-01-15-home-confine.pdf; reproduced in the Addendum to this motion.

not inconsistent with and does not negate a request for a reduced sentence like compassionate release).

**CONCLUSION**

Rodriguez will eventually be released; the only question is when. His current out-date of December 2024 no longer serves justice. The BOP has already acknowledged that he is not a threat to society and that his health issues cannot be adequately managed in a prison environment. Accordingly, Rodriguez respectfully requests that this Court grant compassionate release under whatever conditions this court deems necessary.

Respectfully Submitted,

By: */s/ S. Vance Wittie*
S. Vance Wittie
Texas Bar No. 21832980
vance.wittie@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
1717 Main Street, Suite 5400
Dallas, Texas 75201
Phone: (469) 357-2500
Fax: (469) 327-0860


*/s/* Catherine *Sevcenko*
Catherine Sevcenko
Admitted Pro Hac Vice
National Council for Incarcerated and Formerly
Incarcerated Women and Girls
300 New Jersey Ave, NW #900
Washington DC, 20001
csevcenko@thecouncil.us
617-299-2604 x703

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this motion was served via ECF to all counsel of record, this 16th day of December, 2021.

/s/ S. Vance Wittie
S. VANCE WITTIE